IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|                                                                                                                              |                              |
|------------------------------------------------------------------------------------------------------------------------------|------------------------------|
| HERITAGE FAMILY CHURCH, INC., A KANSAS ECCLESIASTICAL CORPORATION, PASTOR JONATHAN A. DUDLEY, AND ERIC D. SIMS<br><br>*Plaintiffs,*<br><br>vs.<br><br>KANSAS DEPARTMENT OF CORRECTIONS, et al.,<br><br>*Defendants.* | Case No. 18-01259-EFM-KGG    |

**MEMORANDUM AND ORDER**

Heritage Family Church, Inc. ("Heritage Family Church"), Jonathan Dudley, and Eric Sims filed suit against the Kansas Department of Corrections ("KDOC") seeking various forms of injunctive relief related to Sims' exercise of his religious beliefs and Heritage Family Church's prison ministry. This matter comes before the Court on Plaintiffs' motion for a temporary restraining order and/or a preliminary injunction. Sims is the only plaintiff with claims relevant to this motion, and he alleges that KDOC substantially burdened his religious beliefs in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Sims also alleges that KDOC deprived him of his due process rights and retaliated against him for exercising his First Amendment rights by transferring him to a Florida prison. For

the following reasons, Sims is not entitled to relief at this stage of the litigation. Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 6) is therefore denied.

## I. Factual and Procedural Background

Eric Sims has been an inmate in the custody of KDOC since 1993. During his incarceration, Sims became involved with Heritage Family Church's Apostolic prison ministry and developed a relationship with the church's pastor, Jonathan Dudley. In 2008, Sims informed KDOC, via a change of religion request form, that he was now a member of the Apostolic Faith. Since at least 2016, Sims has made repeated requests that KDOC officially recognize the Apostolic Faith as its own distinct religion. Sims alleges that KDOC allows 17 different religions to hold weekly group worship services—what the parties refer to as "call-outs"—but does not offer any call-outs for members of the Apostolic Faith. Sims states that KDOC's lack of separate, Apostolic services forces him to either worship with Protestants, which would be in violation of his religious beliefs, or abstain from worshiping.

According to KDOC's Director of Mentoring, Religious and Volunteer Services, Gloria Geither, KDOC does not officially "recognize" any religion, but rather accommodates inmates' specific religious needs. Sims has identified at least five ways in which KDOC's failure to officially recognize the Apostolic Faith has prevented Apostolic inmates from exercising their religious beliefs. Sims claims that the lack of recognition inhibits access to regular group worship services, bible studies, baptisms, religious texts, and Apostolic-approved clothing.

Before KDOC will authorize a religious call-out, there must be at least two inmates of that religion seeking the accommodation. Sims—as well as Pastor Dudley—have made numerous requests for Apostolic call-outs to be held at all KDOC facilities. Although Sims' motion refers to other inmates of the Apostolic Faith, he has provided no evidence of any other inmate of the

Apostolic Faith requesting a call-out. In December 2017, Sims delivered a request for Apostolic call-outs on behalf of four other inmates; but none of the four inmates made a request themselves, and each of the four inmates had a religious affiliation other than Apostolic. Sims was afforded a pastoral visit with Pastor Dudley, and there is no evidence he ever requested and was denied the opportunity to individually meet with a pastor.[1]

Sims offers other examples of his religious rights being substantially burdened. In December 2016, Sims submitted a formal request to KDOC to allow Pastor Dudley to perform baptisms for other Apostolic inmates at the KDOC chapel, and Sims stated that he encouraged these other inmates to submit a request for baptism services. Sims did not then—or at any other time—request to be baptized himself. Sims also made a formal request to wear long-sleeved shirts in accordance with his religious beliefs on modesty; this request was granted, albeit with a delay of several months. Sims also alleges that on March 19, 2018, KDOC officials at the El Dorado Correctional Facility ("EDCF") took receipt of a FedEx package containing religious texts addressed to Sims. Sims never received this package. On May 15, 2018, he sent a written request to the EDCF mailroom inquiring into the status of his package, and he sent a follow-up inquiry three days after that. Sims was transferred to Florida within a week of making his request and evidently never received a response.

Lastly, Sims stated in his affidavit that on March 23, 2017, he was participating in a bible study in his free time with two other inmates when a KDOC official advised him that he must discontinue the bible study or he would be given a Disciplinary Report for a violation of

---

[1] Pastor Dudley's volunteer status at KDOC was eventually revoked for having unauthorized contact with KDOC inmates, a prohibition applicable to all KDOC volunteers.

K.A.R. § 44-12-325(c). Sims stated that Pastor Dudley reached out to the prison administration regarding this event, and he was informed that inmates are not permitted to organize their own call-outs without formal approval from the Chaplain's office. Sims contends that the same prohibition was not applied to other groups.

On May 20, 2018, KDOC transferred Sims to a Florida prison pursuant to the Kansas Interstate Compact statute. According to KDOC's Deputy Secretary for Facilities Management, Johnnie Goddard, he made the decision to transfer Sims to another state in January or February 2018. Goddard stated that he decided to make the transfer because of issues Sims had with KDOC's medical provider, Corizon. Goddard stated that Sims was not receiving the medical care that he needed, and that Sims "was trying to manipulate where he was going to live." Goddard asked another KDOC employee, Liz Rice, to begin the transfer process; according to Rice, she eventually handed the project off to Doug Burris, the Interstate Compact Administrator. Burris stated that he was not involved in deciding that Sims should be transferred, but that it was his understanding that Sims had filed complaints against doctors employed by KDOC's health provider, Corizon. So, to avoid any further issues, he sought to transfer Sims to a state that did not contract with Corizon for its prison's medical services. It is KDOC's position that Sims was transferred because of these issues with Corizon.

Sims tells a different story. He alleges that "Burris [uses] his power as Interstate Compact Coordinator to subject inmates who file grievances to involuntary inter-state transfers in an attempt to obstruct their ability to exhaust their administrative remedies and seek judicial review of colorable claims against KDOC policies, practices and/or procedures." Sims stated that shortly after his arrival in Florida "it was discovered" that Burris authored a memo dated April 18, 2018, in which Burris provided four reasons for Sims' transfer. None of the reasons involved Sims'

issues with Corizon. According to Sims, the Burris memo stated that Sims was transferred because he was "compromising" KDOC staff and volunteers, because he was communicating with KDOC volunteers and trying to get religious services for himself and other Apostolic inmates, because he was "misleading legislators,"[2] and because he filed a complaint with the United States Department of Justice ("DOJ").[3]

On September 14, 2018, Sims—along with Pastor Dudley and Heritage Family Church—filed this lawsuit, seeking extensive injunctive relief. Plaintiffs filed this motion for a temporary restraining order and/or a preliminary injunction on October 8, 2018. Sims, however, is the only Plaintiff with any claims relevant to this Motion. Sims requests that the Court order KDOC to return him to EDCF, to officially recognize the Apostolic Faith as a discrete religious group, and to hold weekly Apostolic call-outs at all KDOC facilities.[4] On October 29, 2018, the Court held a hearing on Plaintiffs' Motion.

---

[2] On March 27, 2018, Sims mailed Kansas State Senator Laura Kelly a packet containing news articles regarding "the predatory practices of [KDOC's] contracted healthcare providers" as well as "several published law review articles regarding the dangers of outsourcing the essential function of healthcare to for-profit corporations."

[3] Although it is unclear when, Sims filed a formal complaint with the DOJ Bureau of Justice Assistance, regarding a complaint of wage manipulation by private companies that use prison labor. The complaint stated that Sims was owed back wages because he was misclassified from June 2010 to August 2016. On March 9, 2018, the Bureau of Justice Assistance responded to Sims in a letter, stating that Sims had been properly classified.

[4] The Plaintiffs also request that KDOC be ordered to maintain, collect, and produce all emails from the past three years related to Sims' incarceration or Pastor Dudley's volunteer status. The Court makes no ruling now on the scope of discovery, but merely notes that KDOC has a duty to preserve evidence. *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (noting that the duty to preserve evidence arises when a party knows, or should have known, litigation is imminent).

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the movant is entitled to such relief."[5] The legal standard for a preliminary injunction is well-established.

> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.[6]

The parties here disagree about how much evidence Sims must produce to prevail under the first factor. Sims argues that if he demonstrates that the second, third, and fourth factors favor granting his motion, the requirement that he demonstrate a substantial likelihood of success on the merits is relaxed.[7] Although the Tenth Circuit has applied Sims' modified version of the preliminary injunction test in the past, the Tenth Circuit has more recently admonished—based on its interpretation of the Supreme Court's opinion in *Winter v. Natural Resources Defense Council, Inc.*[8]—that this modification is no longer good law.[9] Indeed, "[u]nder *Winter's* rationale, any

---

[5] *N.M. Dep't of Game & Fish v. U. S. Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (quotations, alterations, and citations omitted).

[6] *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quotation omitted).

[7] *See Longstreth v. Maynard*, 961 F.2d 895, 903 (10th Cir. 1992) ("Where the movant prevails on the second, third and fourth factors, the first factor is relaxed to require only that the movant raise questions so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate inquiry.") (quotations and citations omitted).

[8] 555 U.S. 7 (2008).

[9] *N.M. Dep't of Game & Fish*, 854 F.3d at 1246–47 (citations omitted).

modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."[10]

Furthermore, even before the Supreme Court's opinion in *Winter*, the Tenth Circuit held that movants seeking a "historically disfavored preliminary injunction . . . are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[11] To the contrary, when seeking a disfavored injunction, the movant has a *heightened burden* to show that the exigencies of the case support granting the motion.[12] "Three types of preliminary injunctions are specifically disfavored: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."[13]

At first blush, it appears Sims is requesting a disfavored injunction because he is seeking to alter the status quo by asking the Court to order the defendants to transfer him from Florida to Kansas. But Tenth Circuit precedent informs this Court otherwise.[14] Sims' request *is* disfavored,

---

[10] *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

[11] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76 (10th Cir. 2004).

[12] Disfavored injunctions previously required the movant to prove that that all four factors "weigh heavily and compellingly in its favor," but the Tenth Circuit, sitting *en banc*, struck down the "heavily and compellingly" requirement. *See Id.* at 975. The Court notes that some decisions from the Tenth Circuit and the District of Kansas have continued to cite the "heavily and compelling" standard. But the Court discerns, considering *O Centro*'s *en banc* ruling, that this standard no longer governs. Instead, the Court "must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.*

[13] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (citation omitted).

[14] "An injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute developed." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070–71 (10th Cir. 2009) (quotations and citations omitted). In *Schrier v. University of Colorado*, the plaintiff filed suit for injunctive relief, in which he claimed he was wrongfully removed from his position as the University's Chair of the Department of Medicine. 427 F.3d 1253, 1260 (10th Cir. 2005). The plaintiff—who had served as Department Chair for more than 26 years—was removed from his position on October 10, 2002. The Tenth Circuit held that the "last peaceable uncontested status existing between the parties before the dispute developed . . . was on

however, because he is seeking a mandatory injunction. A mandatory injunction—in contrast to a prohibitory injunction—is "an injunction that requires the nonmoving party to take affirmative action . . . before a trial on the merits occurs."[15] As a result, a mandatory injunction "places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."[16] An injunction to preserve the status quo is still a mandatory injunction if it requires affirmative action on the part of the nonmovant.[17]

Here, Sims' request, if granted, would require affirmative action on the part of KDOC: a transfer of Sims back to a facility in Kansas. This type of mandatory injunction is disfavored, and Sims is thus required to meet the heightened burden of proof that accompanies all disfavored injunctions.[18]

---

October 9, 2002, when [the plaintiff] was still serving as Chair of the Department of Medicine." *Id.* As such, the Tenth Circuit held that the plaintiff's request for reinstatement as Chair sought "to preserve rather than disturb the status quo." *Id.*

Furthermore, in *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, the Tenth Circuit rejected the argument that the status quo is defined by the parties' status at the time the action is filed, because then "any party opposing a preliminary injunction could create a new status quo immediately preceding the litigation merely by changing its conduct toward the adverse party" and that "would unilaterally empower the party opposing the injunction to impose a heightened burden on the party seeking the injunction." 269 F.3d 1149, 1155 (10th Cir. 2001). For these reasons the Tenth Circuit "decline[d] to extend the definition of the status quo to invariably include the last status immediately before the filing for injunctive relief." *Id.*

Here, the Court concludes that the last peaceable uncontested status between the parties was before Sims was transferred from Kansas to Florida. Sims, like the plaintiff in *Schrier*, is seeking to preserve the status quo. Sims' request for injunctive relief is not, therefore, subject to a heightened burden on the basis that it seeks to alter the status quo.

[15] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

[16] *Schrier*, 427 F.3d at 1261 (quotation marks, citations, alterations omitted).

[17] *See id.* at 1260–61 (holding that the plaintiff's request for an injunction—although seeking to preserve, not alter the status quo—was mandatory because the injunction would require the University to act affirmatively to reinstate the plaintiff as Chair of the Department of Medicine and would require ongoing supervision by the court).

[18] Accordingly, the Court will not apply Sims' modified version of the preliminary injunction test because the test is no longer valid under Tenth Circuit precedent, and because it was never applicable to preliminary injunctions that were specifically disfavored.

### III. Analysis

Sims' request for a preliminary injunction is based on three types of claims: (1) a free exercise and RLUIPA claim, (2) a due process claim, and (3) a First Amendment retaliation claim. Sims has the burden to demonstrate that each of the four factors in the preliminary injunction test weighs in his favor. Based on the evidence Sims has presented to the Court, he has failed to demonstrate a substantial likelihood that he will prevail on the merits under any of his three claims. Because Sims cannot satisfy his burden under the first factor of the preliminary injunction test on any claim, the Court makes no ruling on the other three factors. Accordingly, the Court concludes that Sims is not entitled to the extraordinary remedy of a disfavored preliminary injunction.

**A.    Free Exercise and RLUIPA**

It is fundamental that to succeed on a free exercise or RLUIPA claim, a prisoner must prove that the government substantially burdened a sincerely held religious belief.[19] The prisoner must connect "the allegedly unconstitutional conditions with his own experience in the prison, or indicate how the conditions caused him injury."[20] Importantly, a prisoner can only bring a claim to vindicate his own constitutional rights, and any attempt to raise a constitutional claim on behalf of other inmates should be dismissed for lack of standing.[21]

---

[19] *Williams v. Wilkinson*, 645 F. App'x 692, 704 (10th Cir. 2016) (explaining that to succeed on a RLUIPA claim a prisoner-plaintiff must demonstrate he "wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government") (quotation omitted); *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) ("[T]o allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff . . . must first show that a prison regulation 'substantially burdened . . . sincerely-held religious beliefs.' ") (quoting *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007)).

[20] *Wieland v. Rucker*, 2018 WL 1400459, at *3 (D. Kan. 2018) (citations, alterations, and quotations omitted).

[21] *Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 747 (10th Cir. 2013); *Swoboda v. Dubach*, 992 F.2d 286, 289–90 (10th Cir. 1993).

In total, Sims identifies five ways in which KDOC's failure to officially recognize the Apostolic Faith substantially burdened his religious beliefs. Sims argues that non-recognition inhibits inmates of the Apostolic Faith from accessing: (1) Apostolic worship services, (2) baptism services, (3) Apostolic sanctioned clothing, (4) religious texts, and (5) informal bible studies. KDOC's position is that it does not officially "recognize" any religion, but rather that it simply accommodates inmates' religious needs. Furthermore, KDOC argues that it has adequately accommodated Sims' religious beliefs.

Sims asserts that his religious beliefs forbid him from worshipping with any group other than the Apostolic Faith, including all Protestant denominations, and the Court does not question the sincerity of that belief. It is KDOC's policy that to hold any group religious activity, two or more inmates identified with that religion must request to participate in that activity. Although Sims refers to "other inmates" of the Apostolic Faith in his motion—even indicating that more inmates will be added as plaintiffs to this suit—he has provided scant evidence that any other Apostolic inmates have requested religious call-outs.[22] Indeed, at the October 29 hearing, Sims' counsel conceded that he had no evidence that any inmates of the Apostolic Faith other than Sims requested and were denied an Apostolic call-out. Simply put, without a group of Apostolic inmates to join, Sims is not substantially likely to succeed on a claim that he was denied group worship services with other inmates.

---

[22] Sims does attach a letter from the "Chaplain's Office" to an inmate identified as "Patterson" that was sent on January 16, 2018. In this letter the Chaplain's Office denied Patterson's request for an Apostolic call-out because he had not designated Apostolic as his religious affiliation. It is unclear from this letter whether Patterson was held at the same facility as Sims, or whether Patterson ever made a subsequent request to change his religious affiliation.

Additionally, Chaplain Eric Shaver, in his affidavit, stated that on December 27, 2017, Sims submitted requests on behalf of four other inmates for Apostolic call-outs. Sims' request was denied because KDOC requires inmates to such requests themselves, and because each of the four inmates had a religious affiliation other than Apostolic.

Sims' next two arguments regarding long-sleeved clothing and baptism appear to lack merit. KDOC approved Sims' request to wear long-sleeved shirts. Although it took several months for KDOC to approve this request, there is no evidence that this was an atypical length of time; and even if KDOC's response was untimely, this is unlikely to form the basis of a First Amendment or RLUIPA violation.[23] Additionally, Sims—by his own admission—never requested to be baptized during his time in KDOC custody. Sims did provide some evidence that other inmates requested and were denied baptism services, but Sims only has standing to address a violation of *his* constitutional rights. None of the other inmates who were allegedly denied baptism services are parties to this lawsuit, and any violation of these other inmates' religious beliefs cannot form the basis for a First Amendment or RLUIPA claim by Sims.

Next, Sims alleges that he was denied access to religious texts. Sims did not discuss the deprivation of religious texts in this Motion, nor could his counsel identify the evidence for this claim at the motion hearing. KDOC's counsel was unaware of this alleged deprivation. Upon review of Sims' attachments, the Court notes that Sims stated in his affidavit that on March 19, 2018, KDOC officials at EDCF took receipt of a FedEx package containing religious texts that was addressed to Sims. Sims never received his package, and he sent a written request to the EDCF mailroom inquiring into the status of his materials on May 18, 2018; Sims sent a follow-up inquiry three days after that. Sims was transferred to Florida within a week of making his request, and there is no indication that he ever received a response to his inquiries.

---

[23] *See Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (finding failures to approve requests for religious accommodation in a timely fashion were, at most, isolated acts of negligence, and did not form the basis for a First Amendment violation).

While denying access to religious texts certainly implicates the First Amendment and RLUIPA's religious protections, there is simply insufficient evidence to conclude that Sims is substantially likely to prevail on this claim. The reason Sims had not yet received these materials is unknown, and it is not clear whether KDOC decided to withhold these materials, or whether there is another explanation for a delay in Sims receiving them. But more importantly, there is no evidence that KDOC withheld these materials because they were Apostolic Faith materials or because the Apostolic Faith is not an "officially recognized" religion. Sims' motion for preliminary injunctive relief requests official recognition of the Apostolic Faith—it does not request access to religious texts. Without evidence that KDOC deprived Sims of religious texts *because* the Apostolic Faith is not an officially recognized religion, Sims has not demonstrated that the lack of official recognition substantially burdened his religious beliefs. Thus, he has not met his heightened burden to demonstrate a substantial likelihood of success on the merits on this claim.

Finally, Sims stated that on March 23, 2017, a KDOC officer told Sims that he could not participate in informal bible studies outside of approved call-outs. At the October 29 hearing, KDOC's counsel stated that KDOC has a security policy against inmates informally gathering in common spaces for any purpose. Although KDOC's counsel did not identify or submit evidence that this policy exists, Sims stated that it was his understanding the policy was set forth in K.A.R. § 44-12-325(c), which prohibits inmates from participating in any "security threat group." The Court has serious doubts that § 44-12-325(c)—assuming this is the regulation on which KDOC relied—is nearly as broad as KDOC represented to the Court, or that it would have justified KDOC's admonition to Sims to stop conducting bible studies with other inmates. That issue, however, is not determinative here. Once again, Sims has not shown that the bible study was

prohibited *because* KDOC does not officially recognize the Apostolic Faith as its own religion. Thus, even if Sims can demonstrate a free exercise violation, he would not be entitled to the injunctive relief that he seeks, because there is no reason to believe that ordering KDOC to officially recognize the Apostolic Faith would remediate that violation.[24] In sum, Sims has failed to meet his heightened burden to prove that KDOC's failure to officially recognize the Apostolic Faith has substantially burdened his religious beliefs.

**B.    Due Process**

Sims contends that KDOC violated his due process rights by transferring him to Florida without first providing him with a hearing. In *Olim v. Wakinekona*,[25] the Supreme Court held that "[j]ust as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State."[26] Accordingly, "an interstate prison transfer . . . does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself."[27] A State can create a protected

---

[24] Failure to exhaust administrative remedies provides an additional reason Sims is not substantially likely to prevail on the merits of this claim. The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust administrative remedies before bringing a suit under § 1983. *See Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted). Sims' counsel acknowledged that Sims did not fully exhaust his remedies, but argued that the administrative process was not fully available to Sims because KDOC transferred Sims from its Norton facility to its El Dorado facility approximately 30 days after this incident. However, Sims was required to file his grievance "within 15 days from the date of the discovery of the event giving rise to the grievance." K.A.R. § 44-15-101b. Sims' transfer to El Dorado 30 days after this incident does not explain his failure to file a grievance within the required 15 days.

[25] 461 U.S. 238 (1983).

[26] *Id.* at 245.

[27] *Id.* at 248.

liberty interest by "placing substantive limitations on official discretion,"[28] but Kansas gives KDOC broad discretion to authorize the interstate transfer of its inmates.[29]

Sims argues that the Court should apply Florida law, and that Florida law provides inmates with a right to a transfer hearing. Sims argument fails for two reasons. First, the Kansas Interstate Compact statute does not require the application of Florida law.[30] Second, the Florida Interstate Corrections Compact statute only requires a transfer hearing when Florida is the *sending* State, not the receiving State.[31] Sims was not entitled to a hearing before his interstate transfer, and he has not shown that he is substantially likely to prevail on his due process claim.

**C.     First Amendment Retaliation**

Although an inmate has no constitutional right to remain at a particular institution, an inmate does have a constitutional right not to be transferred in retaliation for the exercise of his First Amendment rights.[32] To succeed on a First Amendment retaliation claim, Sims must demonstrate:

> (1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct.[33]

---

[28] *Id.* at 249.

[29] *See* K.S.A. § 76-3002, Art. IV, (a).

[30] *See* K.S.A. § 76-3002, Art. IV, (f).

[31] *See* Fla. Admin. Code Ann. r. 33-601.401(3)(b).

[32] *Montez v. McKinna*, 208 F.3d 862, 866, n. 3 (10th Cir. 2000); *see also Banks v. Katzenmeyer*, 645 F. App'x 770, 772 (10th Cir. 2016) ("Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights.") (quotations and alterations omitted).

[33] *Banks*, 645 F. App'x at 772 (citing *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007) (alterations in original).

Sims cites three ways in which he was engaged in constitutionally protected activity. First, he contacted Senator Kelly via mail regarding problems with KDOC's healthcare practices. Second, he filed a formal complaint with the DOJ's Bureau of Justice Assistance regarding manipulation of inmate's wages by private corporations using prison labor. Third, he made continual efforts to get KDOC to officially recognize the Apostolic Faith through the administrative grievance process.

Sims claims that Doug Burris was the person behind the retaliatory transfer. Specifically, Sims stated in his affidavit that Burris uses his position as Interstate Compact Administrator to intentionally prevent inmates using the administrative grievance process from obtaining meaningful relief. Sims refers to having "discovered" that Burris authored a memo on April 18, 2018, in which Burris admitted that he transferred Sims because Sims was "compromising" KDOC staff and volunteers, because Sims filed a formal complaint with the DOJ, and because Sims was "misleading legislators."

Conversely, Burris, in his affidavit, stated that he did not make the decision to transfer Sims, that it was Burris' understanding the request to transfer Sims was related to issues Sims had with KDOC's medical provider, that he was unaware of any religious claims or lawsuits by Sims, and that he had no knowledge that Sims was corresponding with a Kansas legislator. Johnnie Goddard, KDOC's Deputy Secretary for Facilities Management, corroborated Burris' claim that transferring Sims was not his decision. Goddard stated that he decided to transfer Sims, and that he initiated the process in January or February of 2018. Goddard stated that he initiated the transfer

because Sims had issues with KDOC's medical provider, Sims was not receiving the medical care that he needed, and "Sims was trying to manipulate where he was going to live."[34]

Here, the Court focuses on Sims' burden under the third prong of the First Amendment retaliation test. Under this prong, an inmate must prove that "but for" the defendant's retaliatory motive, the defendant would not have taken the complained of action against the inmate.[35] The temporal proximity between the inmate's protected activity and the alleged retaliatory action is an important consideration, but temporal proximity is insufficient by itself to infer a "retaliatory motive."[36]

Sims makes several conclusory and unsubstantiated statements that Burris uses his position as the Interstate Compact Administrator to harass and obstruct inmates who are filing grievances. Sims claims that upon his arrival in Florida he "discovered" that Burris wrote a memo admitting that Sims was transferred because of his contact with state and federal officials. Sims' claim is of limited value, however, because he has not attached a copy of this memo, and he does not explain

---

[34] The Court is troubled by KDOC's proffered reason for transferring Sims. KDOC claims that it transferred Sims to Florida because he was unhappy with his medical treatment from KDOC's contracted medical provider, Corizon. KDOC's goal was to transfer Sims to an out-of-state facility that does not use Corizon's services to ensure he would receive adequate medical care. Although there is some evidence that Sims was unhappy with of his medical treatment, the Court is skeptical of KDOC's contention that Sims was unhappy with Corizon itself. Furthermore, KDOC provided little explanation for why Sims' medical needs could not be met at a KDOC facility or why his medical treatment would improve upon his transfer to Florida.

[35] *Id.* (citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

[36] *Brooks v. Gabriel*, 738 F. App'x 927, 933 (10th Cir. 2018) (rejecting plaintiff's argument that the temporal proximity between his protected activity and the defendant's adverse action established a causal connection); *Banks*, 645 F. App'x at 772 ("In *Gee*, we found the 'but for' requirement satisfied where the inmate's complaint alleged that the defendants were aware of his protected activity, that the inmate complained of their actions, and the retaliatory action was in close temporal proximity to the protected activity.") (citing *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010)); *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014) ("If the defendant's intent in urging adverse action against the employee is not retaliatory . . . then the defendant may successfully defend the retaliation claim. And temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive.") (internal citations and quotations omitted);

in his affidavit how he "discovered" the memo's existence or content.[37]  Sims alleges that Burris was the official with retaliatory intent.  But there is some evidence that Burris was not the one who decided to transfer Sims, that the decision to transfer Sims was made before Sims attempted to contact state and federal officials, and that none of the individuals who made the decision were aware of Sims attempts to contact these officials.[38]  There is, in sum, too much conflicting evidence to conclude that Sims is substantially likely to succeed on his claim that KDOC retaliated against him for contacting a Kansas Senator or for filing a complaint with the DOJ.

Finally, Sims argued that Burris admitted to transferring Sims because he "was communicating with KDOC Volunteers and trying to get religious services for himself and other Apostolic inmates."  To support this argument, Sims once again relies on his own summary of the unattached Burris memo.  The Court reiterates that Sims' summary of the Burris' memo is of limited value.  Regardless, even if Sims' affidavit correctly depicts the substance of the Burris memo, this memo provides little support for Sims' argument that Burris transferred him in retaliation for Sims attempting to secure religious services.[39]  To draw such a conclusion would require stacking inference upon inference.

---

[37] In his Motion, Sims states that a Florida Department of Corrections official shared this memo with him, but Sims does not identify this official, this fact is not contained in Sims' affidavit, and the Court finds no other evidentiary basis for how Sims came into possession of this memo.

[38] According to Goddard, he made the decision to transfer Sims in January or February 2018.  Sims placed his package intended for Senator Kelly in the mail in late March 2018, and it is unclear when Sims reached out to the DOJ Bureau of Justice Assistance.

[39] Sims cites paragraph 32 of his affidavit to support his claim that Burris transferred him because he was attempting to secure religious services for himself.  Paragraph 32 of Sims' affidavit can only be understood in conjunction with part "b" of paragraph 29.  Together they read: "[In the April 18, 2018 memo] Burris accused me of 'compromising' staff and volunteers. 'Compromise' is by general knowledge and understanding within prison, a term used by prison officials when an illegal action by a staff member has been exposed. . . .  As to the reference to volunteers, CM Burris is clearly referring to the communications between Jonathan Dudley, my Pastor, and myself, which KDOC religious officials used as justification to suspend Pastor Dudley's volunteer status."
 The Burris memo is not substantial evidence of retaliatory intent.  First, assuming Burris did accuse Sims of "compromising" staff and volunteers, Burris did not state that this was the reason for Sims' transfer.  Second, Sims

Sims has provided no direct evidence that "but for" KDOC's retaliatory intent he would not have been transferred to Florida. Absent more compelling evidence, the Court cannot conclude that Sims is substantially likely to prevail on his First Amendment retaliation claim, and for this reason Sims is not entitled to preliminary relief.

### III.     CONCLUSION

Sims is not entitled to any relief at this stage. A mandatory preliminary injunction is an extraordinary and disfavored form of relief. Sims has not met his heightened burden to show a substantial likelihood of success on the merits on his free exercise, RLUIPA, due process, or retaliation claims.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 6) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 20th day of November, 2018.

*/s/ Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

infers that Burris' use of the word "compromise" was a covert acknowledgment that Sims had exposed a staff member's illegal conduct, and that this formed the basis for transferring Sims. The statement that Sims was "compromising" staff and volunteers is a remarkably broad one. While Sims' interpretation of this statement is not entirely implausible, it is hardly the only—or the most obvious—inference.